Good afternoon. May it please the Court, my name is Joanna McCallum. I represent appellant and cross-appellate First State Bank of Eldorado. I'd like to reserve the last five minutes of my time for rebuttal. I'd like to start with a motion for summary judgment. The ruling by the District Court was wrong for a number of reasons. First, while we've definitely argued and we contend it was based on both legally and factually erroneous findings of the common law fraud findings from the bench trial, even if those were to stand, they still cannot support the RICO claim. They cannot support summary judgment on the RICO claim because the elements of common law fraud and of RICO are different. With respect to the RICO claim, what specifically are the damages that could possibly be found by a rational trier of fact? Well, the damages that we intended to argue for the RICO claim relate to the loss, the $660,000 loss based on the insurance company's failure to reimburse due to Frontline's fraud. One thing I would note is that at the time of the trial on the common law fraud, totally apart from the fact that the bank wasn't trying to put its RICO evidence into RICO claim forward at that time, the case of Bridge v. Phoenix Bond had not been issued yet, which clarified that for RICO, there does not need to be first party reliance. So at the time of the common law fraud trial, it was necessary in the common law fraud trial to prove that the bank relied on the fraudulent statements. For the RICO claim, it would not have been necessary to... Well, reliance and damages are two different things. I was just asking about damages and what evidence there is that there's approximate cause between the acts that were alleged and the $660,000 that you were just talking about. There's evidence from which inferences could be drawn from the testimony of Ron Revis, who was the financial officer of Frontline, that Frontline misrepresented to the insurance company the amount of premiums that were due, underpaid the premiums. There's a number... Some of the evidence, I mean, I can cite you to the places in the record. For example, volume 6 of the excerpts of record at tab 17, pages 1301 to 102, 1319 to 1320. I have some additional sites if the court's interested. We put in evidence in the opposition to the summary judgment motion to support the assertion that Frontline intentionally underrepresented the premiums due to the insurance company, and as a result, the insurance company didn't pay the insurance claims. We were never able or we never fully developed that because it wasn't particularly at issue at the trial on the common law fraud. But there was evidence in the record to support it. There was evidence in the record from which a jury could draw a reasonable inference. What was the evidence? The evidence is from the testimony of Ron Revis. Is that it? Yes. How about from the insurance company? Is there anything from the insurance company? There wasn't anything in the record from the insurance company. A lot of the dealings... Well, you say that the insurance companies hadn't paid the claims. Was there actually a claim submitted to the insurance companies? Oh, yes. Yes. There were claims for... And they say, well, we're not paying these claims because Frontline... They've said a few things... ...represented the amount of the obligation. They've said a few things. I'm not sure how much of this is actually in the record because some of this took place after the trial, and it's ongoing to some extent. Well, it would be helpful for our purposes if you can sort that out because we can only deal with the record. Yeah, I don't think it is in the record. I mean, I know some various things that the insurance company has asserted in various contexts. I don't want to go outside of the record, but they have asserted to the bank that the bank failed to mitigate its losses, but there's nothing in the bonds themselves, the bonds between the bank and the insurance company, that allows the insurance company to not pay a claim based on a failure to mitigate. All that needs to have happened is that there had been a loss that was covered by the insurance. They've asserted they won't pay because Frontline should pay and that the bank hasn't had recourse to Frontline. They've asserted in litigation against Frontline that Frontline underrepresented premiums to So there's various scenarios going on with the insurance company. It wasn't in the trial court record, and it wasn't in the RICO, in the summary judgment record, because we never – well, the – another aspect of this is Frontline's motion for summary judgment didn't really attack or go through the RICO elements, and they didn't put on undisputed evidence that would negate any of the RICO elements or show that we couldn't prove a undisputed facts, simply listed the court's findings at the trial, quoted the court's findings, which the court also quoted in its judgment. So we were – the bank responded to the motion for summary judgment. It didn't put on its full RICO case in response to that because the Frontline's motion wasn't a Solitex-type motion that called for us to step up and put in all the evidence. Nonetheless, in the opposition to the separate statement, the bank did list out a great deal of its evidence, including the evidence from Mr. Revis that I cited earlier that Frontline underrepresented premiums. Any other damages besides that? That's the – That would be the – Yes. Yes. RICO damages. That would be the RICO damages. Okay. And so we're asserting not only was there evidence in the record from which inferences could be drawn that could have proven that, but also the court erred in relying on its own fraud findings from the – from the trial. Second I'd like to talk about the issue with the discrepancies between what money was paid to Frontline and what money was shown as due on certain reports from the third-party processor. It was undisputed that the amounts that were identified as discrepancies were, in fact, placed by the bank in Merchant Reserve – a Merchant Reserve bank account. That's undisputed. It's also undisputed that that was done per agreement between the bank and Frontline. Even Frontline's expert witness testified that while she didn't agree that that was the appropriate way to handle Merchant Reserves, and she – she disagreed, obviously, with the – the methodology, she agreed that that's what was done in this case, and she also agreed that that sort of relationship, it's governed by the contract between the parties in question, that she was unaware of what the contract called for. She hadn't seen it. She was – hadn't talked to anyone at Frontline about what they did or did not agree to. So the undisputed evidence is that that money was transferred to Merchant Reserves, and the undisputed evidence is that it was ultimately paid out to the merchants. There's no evidence that that money belonged to Frontline or should have been paid to Frontline. In addition, prior to the last day of trial, when the court allowed the amendment to – to have that evidence go to an actual breach of contract claim, while the bank was aware that Frontline was asserting this evidence, and the bank was aware, based on the magistrate's prior ruling, that that evidence might come in for some purpose, the bank had no reason to believe that that evidence could come in as a basis for substantive liability. That just was not on the table at all until the last day of trial. And ultimately, when the judge let it in, a new breach of contract claim was established as of the last day of trial, and the bank was not allowed any witness to – to address that other than the bank employee who had made the adjustments. So while she was – you know, Frontline has had no prejudice because the court gave a lot of time to deal with that. In fact, the court wouldn't let the bank have an expert, and as the court's findings of fact – Why was it necessary to have an expert explain where the money went if we – if your statement is – you just said that the money went back to the merchants? Well, we can – Why – why can't there just be – wouldn't – wouldn't there just be a transaction record that would show that the money was transferred back to the – to the merchants? Yes. Well, there is a transaction record showing that the money was transferred into merchant reserve accounts. The reason we think an expert would have been helpful, partly because the judge's findings of fact and conclusions of law show how persuasive the judge found Frontline's expert. Several times he noted that Ms. Dallas, Frontline's expert, was an expert and very experienced in the industry. The bank's witness was not experienced in the credit card industry. She could talk – she could speak to what happened to the money, and she did, and she submitted, after trial, a three-volume reconciliation that was unchallenged. An expert could have addressed Frontline's expert's contention that it's just never done this way, it's inappropriate in some way, which the bank's witness could not speak to. The – an expert for the bank could have said, as did Frontline's expert, that it can – you know, even if it's proper to do it one way, it's more proper or less proper to do it one way, it can be varied by the terms of a party's – of the party's agreement, as it was in this case. What did the judge say about that after-trial evidence in his findings? He said it was too little and too late. That's about – oh, he said it was too little and too late. He also said it didn't show where the money went. It was the bank's contention that where the money went wasn't at issue, given that it had been established that it wasn't Frontline's money. So it did go to the merchants. That reconciliation did not show the money being paid out ultimately to the merchants, but it showed enough to show that it wasn't Frontline's money in any event. So the reconciliation did not go as far as showing it being paid out. But the evidence is undisputed that it was paid out to merchants or at least used as merchant reserves are intended to be used. If a merchant had a loss, the money was either used to offset that loss or ultimately paid out in this interplater action in the Southern District of Illinois, in which Frontline chose not to make an appearance and chose not to assert any interest adverse to the merchants in that money. The third issue I just wanted to address is the other breach of contract claim, the original breach of contract claim relating to deductions taking place starting at the time the contract was terminated. Frontline and the court relied completely on one section of the contract, which is 6.3b, which talks about money – sums of money that will be credited monthly by the bank to the transfer account. The court's decision was based on the wrong predicate because there's nothing in the contract that says that 6.3b defines money that belongs to Frontline. And in fact, the transfer account is defined in the contract, 6.2a, to be an account that exists to facilitate the two parties paying each other monies that one or the other owes each other in the relationship. The bank has a security interest in that account under 6.2c. The bank can withdraw sums from that account without notice to Frontline or signature of Frontline, 6.2a. Frontline has to keep a minimum balance, 6.3c, at least equal to the amount credited from the prior month. So the fact that the bank is obligated to put money into – or to credit money to that account says nothing about that money belonging to Frontline. And in fact, you need to read the whole contract together, especially Section 6 as a whole, the money discussed in Section 6. It starts out as the bank's money, and then things can be deducted from it with a lot of latitude. There's a lot of different things, I will admit, defined broadly and vaguely. There's not an itemized list of very specific types of things that can be withdrawn. But Frontline gets what's in that particular account. It doesn't make it Frontline's money. And the various items that were deducted, we contend that it was Frontline's burden to prove a breached contract, and what they proved is that money was deducted. And it was deducted, but it was deducted pursuant to the contract, and they failed to prove anything to the contrary. I'd like to briefly address the common law fraud findings. There were a few things in there that just were wrong, either on the facts or the law. The court noted that there was no evidence in the record that the financial statements were false. In context, it wasn't. The court was obviously aware of – is it pronounced Revis? It's pronounced Revis. Yeah. Because that was a centerpiece of your case. And to me, it seems that the court was saying that that wasn't credible evidence, that it believed the other side's evidence. Why shouldn't we read that in context and take it in that sense? Two reasons. One is the court didn't say there was no credible evidence, or I find the evidence convincing that there was no fraud. He said there was no evidence, none in the record. And Revis' testimony, take it or leave it, but it's evidence. The other thing is, it was a centerpiece of our case, but the procedural way this trial was handled, it wasn't – Mr. Revis did not come into court to testify. After the trial was done, after the six days of bench trial, both parties submitted to the court voluminous deposition excerpts, and that's how the Revis testimony came in. It was never argued or presented to the court. It was referenced in the bank's proposed findings of fact and conclusions of law, but as far as you can tell from the judge's findings of fact and conclusions of law, it was not referenced ever. And it was a centerpiece of our case. That's one reason it seems to the bank that the judge didn't really look at it, because we made – we did rely on it heavily and make a big deal of it, and put in several volumes of his testimony. You said you submitted – did you submit post-trial proposed findings of fact and conclusions of law with a memorandum? Yes. Well, I know that we submitted a numbered, you know – Proposed. It was post-trial. Post-trial. Post-trial, including, from the bank's point of view, reference to various items of evidence that were submitted. So do you think the judge took a look at those? I don't know. I don't know. It's not reflected in his finding – in his final findings. Do his findings at all kind of reflect any proposed submissions that the parties offered? I think it reflects Frontline's proposed submissions. It definitely does not reflect the bank's proposed submissions. So you think the judge actually only read half the things that were sent in? Is that plausible? I don't know. I don't know whether that's plausible. I mean, I think it's plausible. I don't know whether that's what happened. But from what we have to go on is his final document, and it says there was no evidence of falsity in the record, whereas there was no evidence to the contrary. Mr. Kittler himself testified that the financial statements were false. So I'd like to reserve the rest of my time. Thank you, counsel. May it please the Court? Counsel. I would first like to address this issue of RICO. And Ms. McKellan, who did an excellent job here, was not the trial lawyer at the case, so she's at a disadvantage. On appeal is the first time that it was claimed that the $660,000 in Frontier bond premiums were not paid because of the financial condition of Frontline. In fact, during trial, the president of First State Bank of El Dorado testified, and this is at supplemental excerpts of the record 171, the question was, Frontier never denied payments on the basis of unpaid premiums, correct? And the president of First State Bank of El Dorado said, correct, that's true. There was evidence in the record that could have been submitted on appeal that, as far as I know, is not in either side's experts of the records of why the insurance company denied the $660,000 in premiums. They denied those premiums on the basis that the bank failed to mitigate their damages. They didn't pursue them fast enough. So Frontier said, we're not paying them. It didn't have anything to do with Frontline's financial condition. In fact, both on the common law fraud claim and on the RICO claim, there is this claim that these four false financial statements, which were admittedly wrong, the parties disagree as to what was wrong with them, Frontline submitted evidence that they actually overstated assets because we had a skullduggerous employee, Ronald Revis, who didn't know what he was doing and was actually stealing money from Frontline, as found by a Minnesota district court, that he in fact did do that. We thought he was trying to cover his tracks. There was never any intent to deceive anybody. But throughout the entire two-and-a-half-year program, there wasn't one bill that went unpaid from Frontline. That's in the record undisputed. There was never a demand for money that went unpaid by Frontline. That's in the record. It's undisputed. In fact, at the close of the program, Frontline had one million dollars of its own money in First State Bank of El Dorado. So even if you assume that it was true that we were intending to deceive them with four false financial statements that came way after the fact, even if you assume that's true, there were no damages based on the financial condition of Frontline. That was the only fraud claim. That was the core element of the damages claim on the RICO count. They had their opportunity during trial to present evidence to the trier of fact, which was the judge. In this case, and I didn't make it clear in my briefing, in this case the reason that the first part of the trial was tried to the judge as a trier of fact is because FSB argued that we had waived our right to a jury trial via contract. So the judge was not sitting in equity. There's lots of cases that are looking at equity and the difference between that. He was sitting as a trier of fact. Nonetheless, it does seem very odd that the judge relied on the law of the case doctrine where the elements of common law fraud and the RICO elements are distinct. Should that matter to us? It shouldn't matter because, number one, you can uphold this decision for any reason. And I think if you look at his summary judgment order closely, I think what he was doing is saying, number one, and he cited to the record, not just to his findings, he also cited to the record and said there's no evidence of damages. Kevin Beckemeyer, FSB, the president of the bank, has said Frontline paid all its bills and the premiums were never denied because of, or the Frontier insurance claims were never denied because of premiums. And he also said the claim that they made at trial, the claim they made is if we would have known we were dealing with a company that was going to send us false financials, we never would have gotten into business with that company. Not because we were hurt financially, but just because we as a bank don't do business with companies that send us false financials. That was the testimony. And Judge Siebel made a legal ruling at that point, which carries over from the common law fraud or from the RICO. He made a legal conclusion that that's not fraud as a matter of law. The fraud has to be connected to the fraudulent conduct. I try to think of analogies, but if I sell you a pickup truck and I tell you the horn works, you have the pickup truck for two and a half years and you never try to use the horn at all. Not once. You sell the truck and then three years later a deposition occurs and you find out the horn didn't work and you sue us for fraud for lying to you about the fact that the horn on the pickup truck doesn't work. The law doesn't allow that. There has to be a legal connection between the false financials and some damage. And Frontline paid all its bills. That was never an issue. The other thing that troubles me is something that opposing counsel raised, which is the district court statement that no evidence was presented to demonstrate the falseness of the financial statements when they were received, etc. And there was some evidence. There was the Revis declaration or deposition, I guess it was, not a declaration, that gave dates and he said the statements were false. And I think there was another employee, Mr. Kahn, who also had some testimony, third-hand information about that. What do we do with a statement that there was no evidence presented as distinct from no evidence that I credit? I think what the judge was trying to do, and even at trial he was frustrated, this was a long trial, a seven-year record, hundreds of thousands of documents, and he was frustrated that you had a bank in there saying that, oh, these four false financials were so terrible we were defrauded. And the judge was going, well, what was wrong with them? And nobody, not Revis, not anybody, Revis says, oh, we misstated liabilities and we misstated assets and the bank said, well, there was a ranch that shouldn't have been part of it. Well, you know, counsel, that wouldn't bother me if he said there was no evidence presented on what effect this had, which he also said, but he said there was no evidence of falsity and that seems incorrect. And I think he was making a credibility determination that as far as the falsity, he couldn't make a determination. We said it overstated assets, they said it understated assets. Of course, in fraud, in common law fraud in Montana, you both need falsity and an intent to deceive, which the judge, sitting through a six-day trial, said, I don't find any evidence, credible evidence, of an intent to deceive. Again, if Mike Kahn, Frontline's witness, was accepted, why would you ever overstate assets when you were trying to deceive somebody? You would understate assets. And so, of course, you need that element, which he found in our favor, and then finally, you need some damages and there is no evidence in thousands of pages of record, all the testimony. Ron Revis certainly doesn't know how First State Bank of El Dorado was damaged. He was Frontline's guy. How would he know when the bank got them, when they read them, and how they affirmatively acted on those? So the court did find that there was no evidence of damages, which are required elements. So even if we could say that his statement, no evidence was presented, it's certainly harmless because his other two findings are correct. The law, there is no evidence in the record of them. The next point I would like to get to is this issue of the $933,000 that was addressed in the opening argument. You start from the preposition of Section 6.3 of the contract, which Judge Siebel found was absolutely clear, that all net program participation fees were Frontline's. The money came in, and even though they flowed through FSB, that was not First State Bank of El Dorado. They were only supposed to take out on a monthly basis three things, net program participation fees, third party processing fees, and chargebacks and credits. During discovery, we found MM541s from an independent third party that list what Frontline's income was, and we simply did the math, and that math demonstrated that there was $933,000 that was owed to Frontline. And the court said, I've got to get to the bottom of this. That's a lot of money. So what I'm going to allow you to do, Frontline, there was a dispute about whether that was part of our complaint, I'm going to allow you to amend your complaint, but First State Bank of El Dorado, I want to know where the money went. You say it's merchant money, and we had three arguments in chambers on this. You say it's merchant money, prove it to me. Do you have those an accountant and vice president. They submitted an affidavit of their vice president, Lynn Byrd, who ran the program, and even though the court told them not to do it, they submitted an expert report from an accounting firm. And in none of that material is there one shred of paper that shows that that money was released to the merchants. If it was the merchant money, it bounced around to, and then here is the money flowing out to the merchant. It didn't happen. And the judge at that point said, based on 6.3 of the contract, based on these MM541s that show Frontline's money and show the discrepancy, and based on the testimony of Lynn Dallas, the person who worked at Global and said that's Frontline's money, based on that overwhelming evidence, Frontline, you're entitled to the $933,000. There was no showing that the money was transferred to the merchant accounts? No. It just left in the merchant accounts? No. And I misspoke, Your Honor. I apologize. It wasn't merchant accounts. It was one single account. First State Bank of El Dorado called it the frozen funds account. And the money went in there, it was co-mingled, and it never left. And that's what our evidence showed. And they had every opportunity over a year to prove that. About a year. I don't want to And they couldn't do it. And so on that basis, the court ruled in Frontline's favor. There was some mention made on opening about the $748,000 that the court found. Again, that was money on 6.3 of the contract was crystal clear. On a monthly basis, First State Bank of El Dorado was to give to Frontline all the money, except for those three things I mentioned. Chargebacks and credit, third party processing fees, or compensation due FSB. During the winding down of the program, during the last three months of the program, all of a sudden, ding, ding, ding, ding, ding, they start grabbing all this money that had never been taken before throughout the entire program. Frontline sends letters, lawyers call. There was never any explanation as to how these 21 items totaling $750,000, how those jive with the contract that allows you to take that money. And counsel is correct that there are other portions of the contract that deal with money, merchant accounts, accounts set up for Visa MasterCard to take their funds from, transfer accounts. There's all these different accounts, but the monthly statements were to be paid pursuant to 6.3 of the contract, which Judge Siebel found was unambiguous. They never, ever rectified as to what points, what contract provisions that money came out of, which was a breach of contract as found by Judge Siebel. There's one question with respect to all this transfer to money that he could help me understand. And that was with the merchant cook? Yes, Wade Cook. It was a claim about double recovery? Yes, that was another point that towards the end of the program, all of a sudden on the bottom of our statements, there was a line item that said, income going into reserve, $80,000. Never done with our agreement, never done with our notice. Our lawyer immediately fires a letter to him saying, what's this $80,000? Never get a response. Now on appeal, they're claiming that that $160,000 that was recouped somehow got put into the Wade Cook account and was given back to Frontline at some point in the record that that money ever was given back to Frontline or that it even went into the Wade Cook account. If you read the briefing, they cite to document exhibit number 433, this is ingrained in my brain, and 433 simply says income going to reserve. There's no backup documentation. There's nothing in there that shows that this money went to Wade Cook and then it was transferred to the transfer account and then was given to Frontline as part of the settlement. There's just no evidence on it. In fact, the court said you refused to do an accounting of that money. If you would have done an accounting, that's what's too little too late. If you would have done an accounting like Frontline asked the very first month of this lawsuit, they fought it. Three months later, they fought it. No accounting. A year later, they fought it. Finally at trial, they looked at the court and said, we'll do an accounting on our dime and we'll prove to you where the money went. And Judge Siebel said, all right, I'm going to give you a year to do an accounting. And still, after a year, they never showed where that money went. There's one other claim that I wanted to address quickly is this rightness argument. They claimed error that Judge Siebel found the $660,000 indemnification was not right. If you look at Judge Siebel's opinion, though, what he is saying is the contract requires you to pursue this money with Frontier before there's a breach of contract. That's different than jurisdictional rightness. I think the judge was just saying, in order to prove breach of contract, you have to pursue, you pursued this to the end with Frontier, and they haven't done that. They haven't done that. Should that be a claim dismissed without prejudice in the event that the steps are later gone through? I don't think so, Your Honor, because he also went further and said, I'm not finding a breach of contract, but I'm also finding that these losses, these $660,000 in insurance losses are due to FSB's own misconduct. And in Illinois, you can't claim indemnification for losses that you caused. And he also said that because they co-mingled these reserves and they couldn't track them and they failed to mitigate them, these are losses. And the final thing he said, I just remembered, is the Wade Cook account money that they're claiming indemnification from, they're saying we should have $660,000 of this indemnification clause. That Wade Cook money, the judge found, was wrongly confiscated, and you can't claim indemnification from a set amount of money that you wrongfully took, that you converted. In the last few minutes, I would just like to address one argument. Judge lots of witnesses, lots of evidence. But I think he made one really significant error, and that's on the issue of attorney's fees. You had two parties that went into a case, and the contract said, if either of you sue each other, the prevailing party gets attorney's fees. And in this case, Frontline sued FSB, FSB sued Frontline. And if you look at this case, whether it's de novo or abuse of discretion, there's been a lot of debate in the briefs over that, and I agree there should be. I think the judge committed an error of law in that respect, because in this case, in Illinois, in order to be a prevailing party, you have to be successful on an issue, and you have to receive an affirmative result. Frontline got both of those, FSB did not. If you were just to look at FSB's 10 counterclaims against Frontline, they sued Frontline for 10 claims and got zero. If you just, no injunctive relief, no change in position by Frontline, they got zero. And if you were just to look at that in a vacuum, the court would have to find that Frontline prevailed, and they failed. You add on top of that, the fact that Frontline got a $2.8 million verdict, you have to find that Frontline was the prevailing party under the law in Illinois. But there was successfully an avoidance of liability on some other claims for $5 million or thereabouts. It was a tort claim, not a breach of contract claim. We sued them for breach of contract on, I think, five, and I apologize if I'm misstating this. I think there were five claims, no, four claims. We recovered on three, and we lost on our bad faith, non-expressed terms of the contract clause. In Montana, you can see on our bad faith, it's a quasi-tort, quasi-contract matter. We lost. But on all our contract claims, we won. And on all eight of their contract claims, we won. The attorney's fees law in Montana, does it allow the trial judge to apportion the amount of fees depending upon the claims that are asserted, the demands that are made, and then the end result? In Montana, he has that discretion, yes, Your Honor. And the question is whether it's Montana or Illinois law. Or Illinois law. Illinois law, I don't know. And I apologize for not knowing the answer to that. I think you can, but I don't know. But my point that I wanted to make in the brief, whether I did it successfully or not, is in Illinois, if you're going to say that there was no prevailing party because each side prevailed, you have to meet the law of the Grossinger case. And in that respect, it requires a affirmative relief, which we got, millions of dollars. First State Bank of El Dorado doesn't meet that. But there are other cases applying Illinois law that say that if you win on some claims and lose on others, even if you have the net recovery, the court is not required to give you attorney fees as the prevailing party. And does the answer to this depend on whether count one is characterized as a contract claim? And I forget, is count one the... Well, the bad faith claim. Yes. If it's considered to be a contract claim. No, I think the law is clear that even if you sue under five contract claims and you win on four and lose on one, so even if it's characterized as a contract claim, we still are the prevailing party because we got a judgment in our favor. And Siebel did. I hereby render... So it's your view of Illinois law that if I win four contract claims and I get $700, but my fifth contract claim was for $10 million and the other side wins, that for my $700, the court has to award me attorney fees? He doesn't have to, but you can't be countered out. What he said is the front line's win was countered out by the fact that First State Bank of El Dorado was also a prevailing party. That's the way I read his order. And I First State Bank of El Dorado, you can't counter us out. It's kind of semantic, though, because if the court had said it the way I've just said it, that I hereby exercise my discretion under Illinois law that I choose not to award fees to this party that obtained a judgment, it would be bulletproof, right? It's a tough argument, but, Your Honors, I think in this case when you have a $2.8 million net verdict as opposed to a verdict where they got nothing on eight counterclaims, if you don't get fees in this case, I would submit to the court that there's no case out there where you can get fees. And the Illinois case law is clear. In the J.B. Esker case and the Tomlinson case, they say, quote, when the contract calls for shifting fees, the court should do it. That was part of the contract between two sophisticated entities. And I think if you're not going to give them in this case, they're not entitled to them in any case. And that's where I think the judge, Judge Siebel, committed an error of law or he abused his discretion. Thank you. Thank you very much. Okay. Well, let me just respond first to the attorney's fees because that's freshest in my mind. Frontline had six contract-based claims, and they failed. So it was not just a question of the bad faith. If you look at the findings of fact and conclusions of law, Volume 1 of the excerpts, tab 5, page 16, the first six claims are breach of contract. Frontline failed on count 2 and count 4. So that's one thing. I mean, the court didn't find that the bank was the prevailing party. The court found that neither party prevailed for the purposes of Illinois law. The standard is abuse of discretion under this and under several Illinois cases that we cited in our briefs. The Peloton case is one of them. R.J. Management is another. It's abuse of discretion. The court is not required to award attorney's fees if the court, in its discretion, does not believe that either party prevailed. The Grossinger case, that does state the law of Illinois, but it describes scenarios in which one party prevailed over the other party. With regard to the other issues, in the RICO claim, it's not correct that on appeal is the first time that we're claiming that the frontier insurance company nonpayment of those bonds are damages. We raised it in the opposition to the summary judgment motion, for example, in addition to the fraud trial. That's docket entry 523 at page 16, in paragraph 61 to 66. That was referenced. The court just didn't mention it. The court's summary judgment order did not address any of the evidence that anyone put on in the motion or any of the elements of RICO. The court just quoted its prior findings on the common law fraud, and that was the end of the story. The testimony of the bank's president, we noted this in our brief, and I don't know if the page cited exactly here, but when Mr. Beckemeyer was asked by Frontline's counsel whether there was evidence that the insurance company had not paid the claims because of Frontline's misrepresentation, the context of that question, right before he asked it, was he said, I'm not excluding the $660,000. My questions to you now are separate and apart from the $660,000. Then he went on to ask a series of questions. So he wasn't answering the question about that money when he was asked that. With regard to the ripeness, Judge Graber's question about dismissal without prejudice, that would have been a more appropriate disposition, especially because since the trial, two of the things that the court said were making it find it unripe have happened. One is Frontier, the insurance company has definitively denied the claims. That was one of the things that was open at the time of the trial. What's your response to counsel's argument that it wouldn't make any difference because under the applicable law, the finding of wrongdoing would preclude your recovery as a matter of law? I have two responses. One is that's specifically with respect to indemnity. That's when we're seeking that $660,000 as essentially a contract claim, that same $660,000 is also attributable to Frontline's fraud, which is separate from its obligations under the contract. Even if it had no obligation under the contract to make the bank whole if the insurance didn't come forward and cover a loss, this is separate. It's our contention that their fraud, totally apart from the contract, set in motion the circumstances that caused the insurance company not to pay. So that's my response on that question. Time's expired. Thank you, counsel. Thank you very much. Case disargued will be submitted. The court will stand and recess for the day.
judges: Reinhardt, Graber, Paez